UNITED STATES *v.* GOLDBERG & SELTZER, INC. (No. 4589)[1]

United States Court of Customs and Patent Appeals, February 1, 1949

*David N. Edelstein*, Assistant Attorney General (*Richard F. Weeks* and *Alfred A. Taylor, Jr.*, special attorneys, of counsel), for the United States.

*Jordan & Klingaman* (*J. L. Klingaman, Edward F. Jordan*, and *Barnes, Richardson & Colburn* of counsel) for appellee.

[1] C. A. D. 399.

[Oral Argument December 8, 1948, by Mr. Weeks and Mr. J. L. Klingaman]

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Second Division, in conformity with its decision, C. D. 1073, sustaining the protests of importer against the classification of and duty assessment upon certain merchandise invoiced as sisal hand bags imported from Haiti and entered at the port of New York. Two protests numbered respectively 112138–K and 112169–K are involved, the two cases having been consolidated for trial.

The Collector of Customs in his report following the appeal to the Customs Court stated that upon the basis of the appraiser's description of the merchandise it was classified "as Mnfrs. or articles in c. v. sisal yard threads or filaments in part of sisal braid," duty being assessed at 90% ad valorem under paragraph 1529 (a) of the Tariff Act of 1930.

The pertinent language of the paragraph reads:

\* \* \* braids \* \* \* made by hand \* \* \* and articles wholly or in part thereof \* \* \* when composed wholly or in chief value of filaments, yarns, threads \* \* \* 90 per centum ad valorem.

The specific claim of the importer relied upon is for classification and duty assessment under paragraph 1023 of the 1930 tariff act reading:

PAR. 1023. All manufactures, wholly or in chief value of vegetable fiber, except cotton, not specially provided for, 40 per centum ad valorem.

The case was submitted upon the testimony of a single witness called on behalf of the importer, six exhibits (four of them designated as illustrative) received in evidence for the importer, and five illustrative exhibits received in evidence on behalf of the Government. All the illustrative exhibits were introduced during the examination and cross-examination of the witness. Exhibits 1 and 2, agreed to be representative of the imported merchandise, were introduced by agreement of counsel for the respective parties.

At the time of testifying, the witness was engaged in the business of importing sisal goods and mahogany from Haiti, having been so engaged for a year. Prior to that time, he was engaged for seven and a half years as a manufacturer of sisal and mahogany goods in Haiti.

The trial court gave a terse and accurate epitomization of the evidence in the case, the pertinent portions of which we here reproduce. It recites that the witness testified substantially as follows:

The material [used in making the hand bags] is obtained from the leaves of the sisal plant; that these leaves are from 24 to 48 inches in length and from 12 to 18 inches in width; that one method of separating the involved material from the starchy green of the leaves is to soak the leaves in water for 14 days until they

become soft and then beat them with a stick until the starchy green separates from the fibers; the other method is what the natives call combed sisal, in which the leaves are not soaked in water, but are simply put in a tree and by the use of a large wooden comb the fibers are separated from the other portion of the leaves. The fibers as thus obtained are then put in bales and tied. They are not stretched out full length or laid parallel; "They are all different sizes, because we just pick out from the bale about 20 pounds. We don't look how it is and just put it in a bath, and we color it or dye it, and then we put it in the sun to be dried." After the fibers are dry they take three bunches and braid them together. "You simply take the three lots out of that bale of fiber and then start braiding." When the operator reaches the end of one bunch of fibers he just picks up another bunch and holds it in place with his thumb until he braids over it and the protruding ends are cut and made even. There is nothing done to these bunches of fibers to make them stick together or stay in place and they are not twisted in any manner. After these braids have been thus formed "We have forms cut from cardboards. We lay the braid all around and sew it by hand together on the fold." These bag plates are then sewn together, using 20, 30, or maybe 50 of these same fibers. In sewing these bag plates or forms together, an individual fiber could not be used because it is not strong enough.

On cross-examination the witness admitted quite frankly that in his experience of making sisal hand bags he had made sisal woven bags and some with sisal embroidered on the bag, and some braided bags with sisal embroidered on them; that he had bought twisted sisal cord and made bags from that; also that he had made woven table mats of sisal fibers; that he was familiar with woven mats in part of embroidery and in part of fringe, all made of sisal fibers.

On redirect examination he testified that in making these woven articles like illustrative exhibit E "We have a frame where sisal is put across the frame and have near one another bundles of fibers and then other bundles are crosswoven on that frame to the sisal fibers"; you take a number of fibers, the same as you would for braiding, and instead of braiding, you weave with that same bunch of fibers. "This sisal fiber cannot be woven in a larger size than approximately 18 to 20 inches"; that if you wanted a larger size, you would have to join the ends of the fibers and then it would show, and commercially that would be no good. A single fiber could not be used to make embroidery because it is not strong enough. "It would break before even going through the bag." He also stated that from an ocular examination he thought the individual sisal fibers that make up illustrative exhibit F are twisted into making a yarn.

It may be said of the importer's exhibits in the case that its Exhibits 1 and 2 are samples representative of the imported merchandise; that its Illustrative Exhibit A is a sample of the fibers of which the braid composing the hand bags is made, the fibers being obtained after soaking the sisal leaves in water and beating them; that its Illustrative Exhibit B is a sample of the fibers obtained by the combing process; that the fibers are the same in character no matter which process is used in separating them from the leaves; that its Illustrative Exhibit C is a coil of dyed sisal fibers; and that its Illustrative Exhibit D is a braid made by the witness in the presence of the trial court by braiding fibers taken from Illustrative Exhibits A, B, and C.

The hand bags involved were made entirely from the braids, there being no knitted or woven material used. Such sewing as was done was done by hand with fibers in the state in which they came from the

leaves (possibly plus the dyeing treatment which is not claimed to have any bearing on the issue here) there being no twisting together of the fibers as usually is done in the formation of thread.

The Government's Illustrative Exhibit E is a sample of hand bags made of woven sisal fibers; its Illustrative Exhibit F is a sample of hand bags made from twisted sisal cord; its Illustrative Exhibit G is a sample of braided sisal hand bags embroidered with sisal fibers (seemingly being, except for the embroidery, similar in structure to importer's Exhibits 1 and 2); its Illustrative Exhibit H is a sample of table mats made of woven sisal fibers; and its Illustrative Exhibit I is a sample of a mat made of woven sisal fibers with a fringed border of sisal fibers and with sisal embroidery on the corners.

The question of the classification of the articles illustrated by the Government's several exhibits is not involved in this case. It is presumed that they were introduced in evidence upon the theory that they would be classifiable under the language of paragraph 1529 (a) of the Tariff Act of 1930, which leads to a duty assessment of 90 per centum ad valorem, and that since the material of chief value—sisal—entering into the braids which compose the involved hand bags is the same as the material of chief value in the Government's exhibits, the former should be classified in the same manner that the Customs officials think the latter would be.

It is obvious that the Government representatives seek to have "fibers" treated in this case as being synonymous with filaments, threads, or yarns, or at least synonymous with one of them, no particular one being specifically suggested.

The trial court correctly stated the issue as follows:

Counsel for the plaintiff [that is, importer] conceded that the imported merchandise was made in part of braid, but strenuously contends that such braids are not made of yarns, threads, or filaments. This leaves for our determination the sole question of whether or not such braids are composed of yarns, threads, or filaments. If they are so composed, then the classification was correct, and if they are not so composed, then the plaintiff is entitled to judgment in his favor.

The court was of opinion that the answer to the question at issue is found in the decision of this court in the case of *United States* v. *Veit, Son & Co.*, 8 Ct. Cust. Appls. 290, T. D. 37540, 34 Treas. Dec. 174, and it quoted the portion of that decision which it deemed apposite.

We think it sufficient to state as to that case that this court there held, when construing certain language in paragraphs 150 and 358 of the 1913 tariff act (the latter paragraph being the predecessor of paragraph 1430 of the Tariff Act of 1922, which, in turn, was the predecessor of paragraph 1529 of the Tariff Act of 1930 under which the instant case arose) relating to trimmings in chief value of lame or bullion, citing authorities, that the bullion as a component material of the trimmings "must be considered in its condition when it enters

into the goods under review, and the question is whether it is then a yarn, thread, or filament, and not whether it may become such after its name and nature are changed by further processing." This court further held, in that case, after quoting definitions of the terms "yarn," "thread," and "filament" from the Standard and Webster dictionaries, that according to those definitions the terms "cover only such materials as are generally known as materials for knitting, weaving, or sewing."

It is the contention on behalf of importer here that the individual fibers (from about 20 to 48 inches in length) of which the braids that composed the imported hand bags were made, were not, in the condition in which they entered the braids, materials for knitting, weaving, or sewing, and that they could not be such without being changed by further processing.

Of the condition of the fibers as they were made into braid, the trial court found, we think substantially correctly:

It is an undisputed fact that these fibers or structures are never produced in lengths of more than 24 to 48 inches and that absolutely nothing is ever done to them in the way of twisting, etc., to remove them from their original status after having the pulpy substance of the sisal leaf beaten or combed from them. Certainly materials which are "generally known as materials for knitting, weaving, or sewing," are not in lengths of not more than 24 to 48 inches. How, may we ask, would a modern loom utilize fibers or structures never more than from 24 to 48 inches in length? How, may we again ask, would a modern knitting machine utilize fibers or structures never more than from 24 to 48 inches in length, or what person today would knit a sweater, a pair of gloves, or a pair of socks with fibers or structures not more than from 24 to 48 inches in length? In addition to the above limitation on length, it should be remembered that the instant fibers or structures are so lacking in strength that a single fiber or structure cannot be used, but it is necessary to use 20 or 30, or perhaps 50 of these single fibers or structures in sewing. Generally, the sewing needles of today are not so constructed as to be capable of utilizing from 20 to 30 of the instant fibers or structures at one time, and it would therefore be impossible to use these fibers or structures in sewing.

The principle of the *Veit, Son & Co.* case, *supra*, was followed by this court in the case of *Rolland Freres* v. *United States*, 11 Ct. Cust. Appls. 321, T. D. 39141, 41 Treas. Dec. 355, in which, among other questions, a question of similitude was involved.

The principle was followed also in the case of *United States* v. *Borgfeldt & Co.*, 14 Ct. Cust. Appls. 240, T. D. 41873, 50 Treas. Dec. 455.

The merchandise there involved consisted of certain rugs described in the decision as follows:

\* \* \* They are made and in chief value of a foundation material of felted goat wool, pounded and pressed together, without further manufacturing process. About the margin of the rug the fibers of which it is composed are drawn out into a fringe from 2 to 4 inches in length. The rugs are ornamented with embroidered designs made with yarn or thread of various colors, the yarns or threads being drawn through the foundation material and worked into such designs upon one

surface. The individual hairs of which the felt foundation is composed are of various lengths, none apparently exceeding four inches, and incapable, without being united with other material and further processed, of being used in weaving, knitting, sewing, or other similar processes.

In our decision there we cited the *Veit, Son & Co.* and the *Rolland Freres* cases, both *supra*, and referred also to the fact that, after the decision in those cases, the Congress enacted the Tariff Act of 1922 containing, in paragraph 1430 thereof, language which we were of opinion did not alter the meaning of that in paragraph 358 of the 1913 act, as it had been construed in the two cited cases, and, in effect, held applicable the rule of legislative ratification of judicial interpretation.

The trial court referred in the instant case to all three decisions so far cited herein, but did not specifically refer to the legislative history. It was probably that court's view that in the light of the three decisions any ambiguity that might have been thought to attach to the statute had been cleared up by those decisions, and, therefore, it contented itself with describing the merchandise and applying the rule established by them.

Without indicating disagreement with the trial court's presumed position in that regard, we think it not improper, particularly because of the view evidently entertained by the collector, to recite something of the legislative history.

In the Summary of Tariff Information 1920 (page 557), prepared particularly for the use of the Committee on Ways and Means of the House of Representatives in formulating the bill which became the Tariff Act of 1922, attention was directed to the decision of this court in the *Veit, Son & Co.* case, *supra* (although the case was not cited by name), but the Congress made no change in the 1922 Act, as this court said in the *Borgfeldt & Co.* case, *supra.*

At page 2038, Vol. 2, Summary of Tariff Information 1929, compiled by the United States Tariff Commission for use in formulating the bill which became the Tariff Act of 1930, the attention of Congress was called to this court's decision in the *Borgfeldt & Co.* case, *supra,* (although the case was not cited by name).

In addition to the foregoing, counsel for the importer here, in a supplemental brief filed by permission of the court, call attention to subject matter embraced in a Government publication stated to have been prepared for use in the preparation of the 1930 tariff measure. It is a memorandum of court decisions affecting the Tariff Act of 1922. In an introductory note it is said:

This memorandum deals mainly with interpretations by the courts of various provisions of the Tariff Act of 1922 which have been construed adversely to the Government.

We have had occasion heretofore to refer to that publication, in connection with the legislative history of other paragraphs, in the

cases of *United States* v. *Bailey, Green & Elger, Inc.*, 30 C. C. P. A. (Customs) 228, 234, C. A. D. 237; and *United States* v. *J. E. Bernard & Company, Inc.*, 33 C. C. P. A. (Customs) 166, 172, C. A. D. 331; and it is deemed proper to refer to it here.

It is understood that the memorandum was an official document carefully prepared to advise the congress of legal phases essential to have at hand in the preparation of a tariff measure. As such, it is on all fours as a reference with the Summaries of Information officially prepared for Congress by the United States Tariff Commission, and we so treat it.

After citing various decisions adverse to the Government in cases involving paragraph 1430 of the Tariff Act of 1922, the memorandum suggested amendments whereby the situation "could be remedied" if the "decisions do not meet the Congressional intent."

For example, this court had held in the case of *United States* v. *Smith & Co.*, 12 Ct. Cust. Appls. 384, T. D. 40544, 46 Treas. Dec. 503, that certain embroidered flouncings were dutiable at 75 per centum ad valorem, as embroideries, under the second part of paragraph 1430 rather than, as contended on behalf of the Government, at 90 per centum ad valorem as embroidered flouncings. The memorandum suggested that this decision might be "remedied" by inserting "embroidered or otherwise" at a designated place in the paragraph. This suggestion was adopted and the phrase appears in paragraph 1529 of the Tariff Act of 1930.

It was suggested that the decision in the *Borgfeldt & Co.* case, *supra*, could be "remedied", if desired, by inserting "fibers" after the words "yarns," "threads," "filaments." Seemingly this suggestion if adopted might have rendered the hand bags here involved dutiable at 75 (not at 90) per centum ad valorem on the basis of paragraph 1430 of the 1922 Act as it then read, but it was not adopted.

While we should feel disposed to agree with the trial court without resorting to the legislative history herein recited, we think that history places the correctness of its conclusion beyond any reasonable question, and we deem further discussion of the case unnecessary.

The judgment of the customs court is *affirmed*.